[1] Reported in 258 N.W. 295.
These cases come here upon appeals from orders denying motions to vacate a decree entered in 1915 when the trustees above named submitted to the district court certain matters in connection with the trust estate, and also from an order approving the trustees' account and overruling certain objections thereto and applications to surcharge the same. Inasmuch as all of the appeals arise out of related facts, we dispose of them in one opinion.
Prior to 1902 Richards Gordon, Paul D. Ferguson, C.L. Kluckhohn, and Charles W. Gordon were partners as Gordon 
Ferguson conducting a large wholesale and jobbing business in the city of St. Paul. In that year they organized a corporation named Gordon Ferguson, Incorporated (hereinafter referred to as Gordon Ferguson), with a capital stock of $700,000, in consideration of which the partnership transferred to the corporation all of its assets, and the corporation assumed the partnership liabilities. The capital stock was divided into 1,000 shares of common stock aggregating $100,000 par value and 6,000 shares of preferred stock *Page 237 
aggregating $600,000 par value. The common stock was equally divided among the four partners, and an agreement was entered into by which that stock could be sold to outsiders only after giving the other stockholders an opportunity to purchase at a reasonable price to be fixed by the board of directors. Ferguson became the owner of 2,659 shares of the preferred stock. He died in 1905 leaving a will which had been made in the previous year by the terms of which he created a trust for the benefit of his daughter, Pauline, who afterwards became Mrs. Emmet. The Northwestern Trust Company and Charles W. Gordon, executors of the will, were named as trustees to receive and take charge of the property and the proceeds thereof, to invest and reinvest the same in first-class interest-bearing securities, and to pay over the entire net income thereof to Pauline during her natural life. In addition to the net income, the trustees were authorized, in the event of her marriage or other contingency, if they considered it necessary for her welfare or advisable for any reason so to do, to distribute to her not to exceed one-half of the principal of the trust. The remainder of the estate, subject to the power of appointment in Pauline, was after her death to be distributed by the trustees to her children when the youngest should reach the age of 21 years. Ferguson's estate consisted largely of the common and preferred stock of Gordon Ferguson. Soon after the executors had transferred to the trustees the trust estate pursuant to the final decree of the probate court, the trustees distributed to Pauline, who since her father's death had married Mr. Emmet, a New York lawyer, the 250 shares of common stock. She sold this common stock to the three other stockholders at $153 per share, which was the then book value thereof plus interest at six per cent since the previous January 1. This sale amounted in the aggregate to $38,972.62. She then purchased from the trustees 400 shares of the preferred stock at par.
Ferguson's will gave full, unconditional, and continuing power to the trustees to sell any and all property and to invest and reinvest the proceeds in such manner as to them might seem best. He also stated in his will that he then considered the stock in Gordon *Page 238 
Ferguson a good investment and authorized his trustees to retain such stock as long as it might seem to them to be safe and expedient to do so "not exceeding, however, a period of five years from and after my death." In 1910 it became apparent that the trustees would be unable to dispose of the preferred stock remaining in the trust at prices which they deemed satisfactory, and the above entitled suit of the Northwestern Trust Company and Charles Gordon against Pauline Emmet and others was commenced in the district court of Ramsey county and the authority of that court sought for the interpretation of the will and the retention of the stock as part of the trust fund until such time as it might be sold for its par value or more. In that suit Ferguson's daughter, Pauline, appeared and consented to and requested the relief sought but did not answer. Her children through their guardian ad litem appeared and answered, praying that the court enter its judgment and order requiring and authorizing the trustees to adopt such a course of action as should be for the best interests of the trust estate and of the minors defendant. Up to this time the trustees had sold only 500 shares of the preferred stock, for which they had received par. March 7, 1911, the district court entered its decree approving the retention as part of the trust estate of the shares of the preferred stock then remaining in their hands and authorizing them to continue to retain the stock until such time as they might receive an offer of purchase at not less than the par value thereof and directing the sale of all or any part at par or a greater price. At the end of the decree it was provided:
"The court reserves the power at the foot of this decree, either on its own motion or on motion of the plaintiffs or defendants or any other person interested in the trust estate, to make such further order and decree relating to such matter as may be required, including the right to hereafter direct a sale of said stock or any part thereof upon other terms than hereinabove provided."
In 1912 or thereabouts Gordon Ferguson found it advisable to erect a building to house their establishment, and this building was completed in 1914 at a cost of approximately $500,000. For *Page 239 
the purpose of erecting this building Gordon Ferguson had caused to be incorporated a Gordon Ferguson Building Company and had subscribed for $150,000 par of the stock of that company. This subscription was later canceled. To finance the erection of the building upon the leasehold where it was constructed, a mortgage of $250,000 was negotiated to one Tenney, a large manufacturer of goods handled by Gordon 
Ferguson, $100,000 was borrowed from the First National Bank of St. Paul, and another $100,000 from the Merchants National Bank of that city. The balance was apparently furnished by Gordon 
Ferguson from current funds. It will thus be seen that the building company had no paid-in capital stock at this time.
To provide funds to finance the building company and to absorb Lanpher, Skinner Company, a competitor, Gordon 
Ferguson devised a plan during 1915 by which the trustees, for Mrs. Emmet and Mrs. French, a sister of Charles W. Gordon, were each to exchange 1,500 shares of Gordon Ferguson preferred for a like number of shares of the building company's common stock. Gordon Ferguson were to find purchasers for the preferred stock at par which would provide $300,000 of the needed capital. This was to be used to satisfy the debts other than the Tenney mortgage, which was somewhat reduced. Some of this preferred stock was to be placed with the Lanpher, Skinner people who came into Gordon Ferguson and some with manufacturers who sold to that company. The remainder of the building company's indebtedness was to be left in the Tenney mortgage, which required its principal to be reduced $20,000 annually. Gordon Ferguson, during the next ten years, was also required to find purchasers at par for 1,000 shares of preferred belonging to the two women. Gordon Ferguson was to take a 20-year lease of the building with renewal provisions, pay the ground lease and taxes, and $30,000 a year to the building company, plus $3,000 a year into a trust fund to be distributed to it at the end of 20 years. Thus the mortgage was to be paid off and the building company with a capital of $300,000 would become the owner of the building on the ground lease. If Mrs. Emmet remained the owner of the building company stock, *Page 240 
her income would be immediately reduced but would increase from year to year as the Tenney mortgage was paid off. The principal of the trust would be augmented at the expense of the life tenant, but after ten years the arrangement was calculated to increase her income. Mrs. Emmet and her husband, who specialized in trust matters, were fully advised of all details of this arrangement, and the whole transaction was submitted to prominent business men of St. Paul who approved of it as in the best interests of the trust estate. With the consent of Mrs. Emmet and the guardian ad litem of her children, the exchange of stock was approved by the supplemental decree now under attack. The trial court found that it was the only possible arrangement by which the preferred stock could be disposed of without in large measure destroying the estate. This preferred was a six per cent stock and was found not to be marketable at par except as it might be sold to employes or others who had special reason for the purchase. One open sale was made at 70. Therefore the common stockholders, who were largely owners of preferred which they desired to dispose of, authorized the issuance of seven per cent preferred stock to take up the old six per cent stock, and provision was made to take up the old stock for cash. The state of incorporation was changed to Delaware to avoid double liability. At that time Gordon 
Ferguson was in a prosperous condition. Mrs. Emmet, who still owned some preferred stock, exchanged it for the new preferred instead of taking cash. The preferred and common stock of Gordon Ferguson ceased to have value some years ago. The building company stock still has value and pays dividends.
1. Appellants attack the distribution of common stock to Mrs. Emmet as in effect a sale by the trust to Gordon and his associates and ask that the trustees be charged with the profits which Gordon made or might have made out of the transaction. The trial court has found that her claim that as part of this distribution she was induced to buy Gordon 
Ferguson preferred is untrue. We think the evidence is well-nigh conclusive in support of this finding. The distribution may have been made pursuant to an arrangement made prior to the transfer of the stock from the executors to the *Page 241 
trustees. Mrs. Emmet had been recently married, and the will contemplated that her marriage "or any other contingency whatsoever" might be occasion for distribution. The trustees were endowed with a wide discretion in this regard. By the terms of the testator's contract the stock was not salable outside of the three other stockholders without first offering it to them at a price to be fixed by the board. It is evident that they proposed to buy it at its full book value and suggested that she invest the proceeds in good bonds or Gordon Ferguson preferred. She chose to buy the preferred. She was of full age, married, and competently advised. Neither she nor the children can avoid the transaction.
2. Mrs. Emmet, although she did not answer in the 1911 proceeding to which she was a party, did consent to and request the extension of time in which to dispose of the preferred stock. She subsequently consented to the 1915 decree. The children appeared and answered in 1911 and asked for the adoption of a course of action that should be for their best interests. We think the reservation of jurisdiction to make further order or decree was well within the equitable powers of the court in a proceeding of that character. Its supervisory powers were invoked, and the decree, construed as a whole, could not be considered as final or as divesting the court of jurisdiction. The relief set out in the decree was obviously consistent with the complaint and so intimately connected with the relief sought as to be before the court. The answering defendants were therefore bound. 2 Mason Minn. St. 1927, § 9392. And likewise the members of their class not yet in being. Mayall v. Mayall, 63 Minn. 511, 65 N.W. 942. They again appeared by their guardian ad litem in 1915 and consented to that decree. Neither she nor the children can now attack the decree for lack of jurisdiction. It is her claim that she was not made aware that Gordon was obligated on the bank loans which would be taken up when Gordon Ferguson sold the preferred stock owned by the building company. The trial court has found otherwise. The plan before it disclosed an indebtedness of the building company to Gordon Ferguson of $300,000. With this disclosure, the fact that Gordon indorsed the notes to the banks to obtain the money thus lent would *Page 242 
seem immaterial. Whether these loans would be taken up out of proceeds of the preferred stock depended entirely upon Gordon Ferguson's ability to market the stock. Otherwise Gordon 
Ferguson would have to take up the loans from other funds. Mr. Emmet had been advised that Gordon and Kluckhohn must under-write the sale of this stock in order to pay the building company's debts which were backed by Gordon Ferguson. That Gordon and Kluckhohn might have to take or did take some of the preferred stock which the building company got from the trustees would also seem to be immaterial. We think Mrs. Emmet's claimed ignorance of this feature is altogether too frail a reed on which to hang a charge of fraud. Certainly the record indicates that she knew all else there was to know about Gordon's interest or that of the trust company in the transaction. If she is to vacate the 1915 decree for fraud, she must show the fraud. Wann v. N.W. Trust Co. 120 Minn. 493,139 N.W. 1061.
Her claim that the representation made to her that the preferred stock was not salable at par was false; and that it induced her to consent to the 1915 decree is also unfounded. It is quite apparent that the six per cent preferred which the trust owned at that time was not salable at par except as it was forced on the people who sought an interest in the corporation for reasons that would not influence purchasers in the open market.
The exchange of stock in 1915 was found by the court to be in the best interests of the trust and the only practical solution of the disposition of the preferred stock without destructive sacrifice. It can scarcely be contended then that the court had not the power to authorize the exchange. Mayall v. Mayall,63 Minn. 511, 65 N.W. 942. Upon competent disinterested advice Mrs. Emmet consented to and requested the supplemental decree approving the transaction. The trial court found that she and the court were fully advised of all the ramifications of the deal and of the trustees' interest as they might be affected thereby. There is now no transcript of what was presented to the court, but the record tends to show that it had before it the plan in detail. Mrs. Emmet's relation to the situation was such that she could hardly be ignorant *Page 243 
of the terms of the plan. It appears to have been formulated in a document and studied by all those interested. Further, the court found that she did not rely on representations made to her by either of the trustees but sought and obtained competent advice elsewhere. All of these findings are fully justified by the record. Obviously the transaction was in the best interests of the trust, and time has demonstrated its wisdom. The arrangement contemplated that the two women or their successors in interest would become the owners of the building clear of all superior interests except the ground lease. The building had cost $500,000 at a time when building costs were low. Their investment in it was little more than half its cost; they had a tenant which appeared to be responsible and permanent. But Mrs. Emmet argues that in 1922 the trust could have realized cash for the preferred. This seems improbable. Had not the common stockholders been loaded up with the preferred and the corporation with the obligation to dispose of it by the 1915 deal, it is altogether unlikely that they would have consented to the change in the character of the preferred which made it marketable or redeemable in cash. Mrs. Emmet herself thought the seven per cent preferred was preferable to cash.
Nor was it reprehensible for the trustees to retain the building company stock. The court justifiably found that it could not have been sold except at a price below its intrinsic value.
By our disposition of the preceding questions it necessarily follows that the other questions discussed by appellants are disposed of against them or become immaterial. We may say that we are impressed by the record with the fairness of the trustees' conduct toward Mrs. Emmet. Mr. Gordon was evidently moved by sincere consideration for her best interests and was even so generous toward her as to give her a large share of the fees allowed him as trustee.
The orders appealed from are affirmed. *Page 244